THE BERKMAN LAW OFFICE, LLC

111 Livingston Street, Suite 1928
Brooklyn, New York 11201

Tel: (718) 855-3627 Fax: (718) 855-4696

August 15, 2020

**BY ECF**
Hon. Brian M. Cogan
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Zeitlin v. Palumbo, et al.*
Case no. 20-cv-510

Dear Judge Cogan,

The undersigned represents Plaintiff in the matter referenced above. Defendants' motions to dismiss are *sub judice* before the Court.

Today's *Wall Street Journal* carried an article about Defendant Palumbo's involvement with robocalls that may be useful to the Court as background. A copy is enclosed.

The article can also be accessed via the following link: https://www.wsj.com/articles/where-robocalls-hide-the-house-next-door-11597464021?st=hpwo4v78p8hf5yk.

Respectfully yours,
/s/ Robert J. Tolchin
Robert J. Tolchin

cc: Theodor D. Bruening, Esq. (by ECF)
Joseph R. Conway, Esq. (by ECF)

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/where-robocalls-hide-the-house-next-door-11597464021

BUSINESS

# Where Robocalls Hide: the House Next Door

Mom-and-pop carriers are a key link in the telecom system. They can also open the door to scams.

*By Ryan Tracy and Sarah Krouse*
Aug. 15, 2020 12:00 am ET

When you receive a robocall, chances are someone like Nick Palumbo collects roughly $0.0024 a minute. Those fractions of a cent can add up to millions of dollars. Mr. Palumbo accumulated more than $3.2 million on the hundreds of millions of calls routed through a telecom operation based in his Paradise Valley, Ariz., home last year.

Two phone companies run by Mr. Palumbo are among dozens of little-known carriers that serve as key conduits in America's telecom system. But the rise and fall of those companies also illustrates a flaw in that system: The business model of these carriers can support fraud on a massive scale.

In the span of a few years, one of Mr. Palumbo's carriers became the largest conduit for Social Security impostor calls coming into the U.S. from overseas, according to authorities. It connected swindlers posing as officials from the Social Security Administration with victims who relinquished their money or personal information. Such scams in total bilked U.S. consumers out of at least $38 million in 2019, according to Federal Trade Commission data and government officials.

More government impostor robocalls were traced to Mr. Palumbo's carriers than any other phone company for much of 2019 and the early months of 2020, according to USTelecom, a trade group that runs a call-tracing system. He says he didn't know the calls were scams when his companies passed them along. On March 24 a federal judge temporarily barred Mr. Palumbo's phone operations from carrying any more calls in the U.S. following a civil lawsuit from the Justice Department. He shut down Ecommerce National LLC, which did business as TollFreeDeals.com, and SIP Retail LLC, his lawyer said.



Nick Palumbo accumulated more than $3.2 million on the hundreds of millions of calls routed through a telecom operation based in his Paradise Valley, Ariz., home last year. Authorities said one of Mr. Palumbo's carriers became the largest conduit for Social Security impostor calls coming into the U.S. from overseas. Mr. Palumbo said he didn't know the calls were scams.

**PHOTO:** NICK PALUMBO

Mr. Palumbo and dozens of other little-known telecom carriers work in the shadows of giants such as AT&T Inc., routing phone calls in bulk from one part of the telephone network to another and charging customers a fraction of a cent each time. These small carriers took hold in the decades following the 1984 breakup of AT&T's phone system monopoly, which was designed to lower the costs of long-distance calls. They mushroomed during the introduction of internet-based calling services in the 2000s.

The emergence of these small phone companies was in many ways a positive development for consumers who now pay less for long-distance calls. The downside is that the system

wasn't designed to discern between legitimate and illegitimate calls, which are sometimes mixed together as they are passed along. U.S. regulators generally didn't require these carriers to block calls and in some cases forbade them from doing so as a way of limiting anticompetitive behavior. Some telecommunications experts say that opened the door for smaller carriers to hustle business from robocallers, or simply turn a blind eye to suspect traffic.

Big carriers thus far have largely been able to avoid government penalties by demonstrating their efforts to verify legitimate traffic, in some cases hiring third-party companies to spot bad calls and flash a "Scam Likely" message to your phone.

Here is how the scams typically work: First robocallers blast out a large number of calls embedded with a prerecorded message claiming to be a representative of the Social Security Administration or another government agency. If the calls originate overseas, as many do, foreign carriers forward them to U.S. carriers that contract with each other to send and receive the traffic over the internet, using routers to find the cheapest path. A major U.S. carrier then typically makes the final connection to your phone.

When you answer, the prerecorded voice on the other end of the line claims you're the victim of a stolen identity or a participant in criminal activity and that you need to call a number to fix the issue. If you fall for that premise, a swindler will use a mix of threats and reassurances during a live conversation to extract as much of your personal information or money as possible in exchange for supposedly clearing your good name.

Smaller carriers say the U.S. government should be going after scammers who are originating these robocalls. Law-enforcement officials say it is difficult to punish scammers directly, in part because many are based overseas. Instead authorities are targeting the small domestic telecom carriers that carry the calls into the U.S. and testing a relatively new legal argument in the telecom world: that carriers should be held responsible for policing any bad behavior that passes through their networks. Federal agencies have over the last year won injunctions curtailing the business of two other carriers, and have written warning letters to dozens of others.



Gail Ennis, inspector general at the Social Security Administration, assisted the Justice Department in its case against Nick Palumbo's phone companies. The pursuit of robocall scams, she said, is 'going to be a marathon, not a sprint.'

PHOTO: JUSTIN T. GELLERSON FOR THE WALL STREET JOURNAL

One of the earliest targets of the government's crackdown was the 39-year-old Mr. Palumbo, a well-known figure within this community of tiny phone carriers that swap tips and cut deals in online forums or annual telecom conferences in Las Vegas. There are varying views within that community about his level of responsibility. Some said he should have vetted his customers more carefully or cut them off when he saw red flags; others said he followed standard industry practices.

Mr. Palumbo said there are many legitimate uses of robocalls, such as telemarketing, and because he relayed calls rather than placing them, he had no way of knowing which calls

were scams. “We can’t listen to the calls,” he said in an interview. “The system doesn’t allow us to, nor do we have the authority to.”

Mr. Palumbo’s lawyer said his client acted appropriately after receiving warnings about problematic calls, including notifying the customer who sent the calls. Even if his companies did more vetting, Mr. Palumbo says he wouldn’t know the source of calls because his clients were telecom carriers, not call originators. “It is really difficult to know who the customer’s customers are,” he said.

## In Search of $250 Million

Long before he got into the telecom industry Mr. Palumbo knew he wanted to make an impact in the business world.

He started at eight years old, while growing up outside Buffalo, N.Y., “selling suckers, hawking pencils, clipping lawns [and] snowplowing,” he wrote in an autobiographical essay published in the 2014 book “Rainbows In Cobwebs.” “Anything that would earn some money.”

In college, he worked as a nightclub bouncer and started a business selling paintball supplies online, staying up late drinking Red Bull and working on the product catalog. He recalled telling a friend he would be worth $50 million someday, but secretly set a goal of $250 million.

His introduction to the telecom industry came in 2003, when he began selling access to toll-free numbers. In 2009, he moved to Arizona and began working as an agent arranging call-routing contracts between telecom carriers. He met his future wife, Natasha, in 2013 on a friend’s boat on Lake Pleasant near Phoenix. The following year he hired her.

## Robo Relay

One Arizona couple relayed overseas robocalls that prosecutors say bilked U.S. consumers. Nick Palumbo, who led the operation, said he didn't know the calls were illegal and took action when he learned they had been used in scams. Natasha Palumbo declined comment.

**How it allegedly worked**

1
**Overseas scammers,** many of whom were in India in this case, blasted out calls themselves, used a call center or both.
2
**Overseas carriers** forwarded the calls to the U.S.
3
The **Palumbos' phone companies,** which operated from the couple's U.S. home, received call traffic and directed calls to U.S. carriers.
4
The **U.S. carriers** passed calls on to big carriers
5
The **big U.S. carriers** passed calls through to U.S. customers.
6
**Customers** received recordings or live calls from the money-seeking scammers who often pretended to be with a U.S. government agency.

Source: court records

Business was good, but unsteady, Mr. Palumbo said in the interview. In 2016, several deals he arranged fell apart, robbing him of expected paydays. He decided to become a carrier himself.

He was able to do so from his home. He created an account with SipNav LLC, a company that leases access to call-switching equipment and software. SipNav accounts start at a minimum of 2,000 simultaneous calls for $1 a month, according to its website. Starting a phone company that operates over the internet—known as a voice over internet protocol or VOIP provider—takes at least $10,000 because of the need to prepay vendors before ramping up call volumes, he said. He declined to provide his exact costs.

"SipNav has no tolerance for Illegal robocalls" and is "doing everything in its control to help mitigate these illegal actions," the company said in a statement.

Outfits like SipNav provide another important link in the robocall supply chain. They provide online portals for small telecom carriers to configure pricing, track call traffic and onboard clients. Mr. Palumbo had to find customers – or set up a website and let them find him.

Mr. Palumbo said his business took off, thanks to contacts in the telecom industry, trade shows, and customers who found him through online searches or LinkedIn. His clients included phone companies in India, which authorities say is a hot spot for robocalls. Gaurav Soni, the owner of one of those clients, ICore VOIP, found Mr. Palumbo via a Google search for U.S. telecom companies in early 2019, Mr. Soni said in an interview. “There are so many companies who are working like Nick,” Mr. Soni said.

Mr. Soni said he signed up with Mr. Palumbo online. Mr. Palumbo didn’t ask about the origin of the calls ICore would be sending, Mr. Soni said. Mr. Soni said he ran a phone company, not a call center, and wasn’t aware of the content of calls sent to the U.S. He said he understood his customers to be legitimate call centers that offer services such as information-technology help.

Mr. Palumbo eventually attracted enough clients to become the connection point for billions of calls to the U.S. telephone network. At their peak, Mr. Palumbo’s businesses had 38,000 phone lines, paying 80 cents per line a month. Clients paid about $0.0024 per minute for internet-based calling, according to business invoices included in court documents.

His businesses pulled in $3.2 million of revenue in 2019, or $266,000 a month.

## A Morning Raid in Arizona

That good fortune ended on the morning of January 28, not long after Mr. Palumbo and his wife completed an ordinary morning of watching TV, having breakfast and preparing their daughter for preschool. As Mr. Palumbo carried his 3-year-old to the car, federal agents stood at the gates of his property with their guns pointed at him, he said in an interview and court documents.

“Put your daughter down,” one said, as Mr. Palumbo recalled it. He says he spent the next 90 minutes in handcuffs while officers searched the $2.3 million home, hauling out computers and paperwork.

Mr. Palumbo's wife was also named as a defendant in the government's case and was CEO of one of the companies involved. She declined to comment through a lawyer.

**Robo Rings**

Estimated robocalls in the U.S.

Source: YouMail

One alleged victim of a scam that started with a call transmitted by one of Mr. Palumbo's companies was John Knox, a retired fire marshal who died in March. He sent $9,800 to a scammer who called him on May 23, 2019, according to court filings and a February interview with Mr. Knox. The swindler, whose call was passed along by the company, left a voice mail saying Mr. Knox's Social Security number had been compromised.

"I'm usually sharp as a tack. That day they caught me," Mr. Knox said in an interview, adding that he had been dealing with family turmoil at the time.

After the raid on Mr. Palumbo, the Federal Communications Commission in February began sending public warning letters to other small carriers. One was Karl Douthit, CEO of Los Alamitos, Calif.-based provider Piratel LLC, who says the FCC singled him out unfairly. Piratel hasn't been associated with nearly as many robocall traces as Mr. Palumbo's companies, and has long been vetting customers to avoid getting stiffed on bills, he said: "We have turned away more customers than we have kept."

Mr. Douthit said the business of connecting calls over the internet is rife with opportunities to make a "quick buck" routing a high volume of calls without asking questions. He said he didn't work with Mr. Palumbo.

Others defended Mr. Palumbo. Dean Hansen, a telecom consultant who filed a court brief in support of Mr. Palumbo as part of the government's case, described him as a friendly, savvy businessman who followed standard industry practices.

## Tracking the Fraud

Prosecutors said they uncovered the participation of Mr. Palumbo's companies using a process called "traceback," a system developed by trade group USTelecom that follows a call backward to identify the phone companies that connected it. USTelecom had traced many such calls to the companies and notified Mr. Palumbo each time, according to court filings.

Mr. Palumbo didn't dispute receiving notifications from USTelecom, but said USTelecom never told him he was an outsize conduit of suspect calls until after the government brought its case.

Sometimes the traffic had obvious red flags, such as calls coming from overseas posing as 911, the Justice Department said. Mr. Palumbo's lawyer said he blocked the 911 number after receiving a complaint and acted appropriately after receiving the USTelecom warnings. Each time, he warned the carrier who sent the problematic call and blocked the phone number in question.

But prosecutors said the scam calls continued for months over Mr. Palumbo's network, even after the warnings. And they pointed out during the case that scammers can easily switch numbers once one is blocked.

---

SHARE YOUR THOUGHTS

*Should phone carriers be held responsible for robocall scams that pass through their networks? Why or why not? Join the conversation below.*

---

In one June 2019 episode, USTelecom notified Mr. Palumbo of a Social Security scam call that had been relayed by his company, and he identified the source of the call as a customer from India. A USTelecom representative emailed back with a warning: The calls were "a massive illegal calling campaign." Mr. Palumbo replied that he reamed out the client, according to court documents. In an interview this week, he identified the client as Mr. Soni, the ICore owner who found him on Google.

Mr. Soni said he shut down the account of the customer who sent the call Mr. Palumbo identified. The pair continued doing business through 2019, they both said.

Mr. Palumbo could've blocked ICore's account if he was worried about the calls, Mr. Soni said. "How would I force him to open my account?" he said. "They never used to ask, 'Who are you?' They want the money and the calls, that's it."

Mr. Palumbo's lawyer says his client acted appropriately by notifying ICore, and he understood that problem accounts had been shut down.

Mr. Palumbo's companies didn't have a compliance program, his lawyer told the federal judge, though it did have a template for onboarding new clients. Mr. Palumbo said in an interview that he checked customers' references but it was possible for clients, including international ones, to sign up by filling out an online form.

Industry standards on how much vetting is required are vague or nonexistent, Mr. Palumbo's lawyer said. Government rules encourage carriers to connect calls regardless of their origin rather than ask questions, executives at other telephone companies said.

"We connect calls. We do not block calls. That goes against our complete DNA," said Lamar Carter, CEO of All Access Telecom Inc., a VOIP provider based in Forney, Texas.

The FCC in July asked for public input on the idea of requiring phone companies to conduct due diligence on high-volume customers. Those regulations, which the FCC hasn't formally proposed, could require phone companies to ask questions about whether a customer is running a legitimate business before they allow someone to make high volumes of calls.

The shutdowns of Mr. Palumbo's companies haven't ended the flow of robocalls in the U.S. Volumes are on the rise again following a significant slowdown during the beginning of the coronavirus pandemic. From March to May, government agencies moved to quickly tamp down on Covid 19-related scams, and global shutdowns stymied some fraudsters' ability to access call centers.

"The worry for us is of course that the volume just shifts to another player. That very well may be what's happening," said Gail Ennis, inspector general at the Social Security Administration, which assisted the Justice Department with the Palumbo case. "It's going to be a marathon, not a sprint."

**Write to** Ryan Tracy at ryan.tracy@wsj.com and Sarah Krouse at sarah.krouse@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.